My name is Roger Laguna, I represent the petitioner, Hayes' Berceno-Flores. If I may, I'd like to reserve about five minutes for rebuttal. Your Honors, briefly, Mr. Berceno entered the country in 1984 undocumented. He was about 19 years old. He's worked hard, opened a restaurant here, grocery store, bakery. He's got three children and a wife. He's been here for 23 years at this point. During proceedings where he was challenging deportation, the government raised the argument that he had been convicted for crimes of moral turpitude under 240C3B of the INA Act. And they said, therefore, he's not eligible. And there are some side issues, incidental issues, about whether or not it's looking forward or looking back. But quite frankly, I think that the crimes of moral turpitude, whether or not... Whether it's forward or back, he doesn't qualify? He doesn't, Your Honor, and that's because recently they changed the law and his prior counsel had attempted to put that argument forward. It's there, but it's, quite frankly, it's moot. And so I think whether or not, if this court decides that there was sufficient evidence that, in fact, the acts that the government says are crimes of moral turpitude did, in fact, happen and they are classified as such, then I believe the rest of the argument is removed. Well, he admitted during the hearing committing the acts in question, did he not? You're talking about the incidents of spousal abuse? No. In fact, that's in a footnote in the government's brief. There are two acts which were considered and which were alleged and which the government attempted to put forward and which the BIA actually considered. Those are the petty thefts? Yes. 85 and 89. Petty theft, they said, when he was about 20 years old, I guess it would have been, that he stole a bottle of booze and he stole a T-shirt. And that was, again, when he was 20-some years old. Now he's 40 and he has a grocery store and there's nothing else. They did question him about police being at the house for a domestic dispute. But you don't dispute that if, if I understood what you were saying a minute ago, you're acknowledging that if those things happen, long ago though they may have been, petty thefts, that's it, the way the statute's written, the clock stops and the game is up on them. Is that right? Yes, Your Honor. I think the statute's very clear as it's amended. Before that, it was a little ambiguous, but I think it's clear now. Educate me, what's the amendment? And right now, at this point, these crimes, if they are crimes classified as malturbative, they would be enough to get them deported. But not on the grounds that were issued in this case? No, I don't believe so. It would be different grounds? Yes. I see, all right. And so that's late coming. The argument was asserted early on, but now no. It would be deportable now as a criminal alien? Well, not as a criminal alien, but his motion to stay deportation, which was granted by the trial court, would be vacated because the crimes were committed. And the trial court said, these are not crimes of moral turpitude, and expressly said in the transcript, and I can cite it for you, said these are not crimes of moral turpitude. It was the immigration judge, right? Yes, the immigration judge, I'm sorry, said these are not crimes of moral turpitude as the statute considers them. And furthermore, though the averments have been made that he was involved in this conduct, on page 15 of our brief, we cite some of the language. It says the court has never received a record of conviction concerning his acts. The court cannot find that Percento was convicted of any crime involving moral turpitude. Neither party has provided the court with a record of conviction in this matter. The court, again, was unable to determine exactly even the nature of these events, nor the nature of the conviction, if there would have been any. What happened is he said, yeah, when I was young, I was down in Texas, and we were partying, and I stole a bottle of liquor, and the cops came and arrested me, but I think it was thrown out or I'm not sure. I don't even remember. It was 20 years ago. And that is not a conviction. Now, the government's been arguing, well, under the new law, you could say the crime was committed, and he committed it. I don't think so. Because he admits they had contact with police, and he was arrested for that, but he thinks it was thrown out or something. I don't think you can say the crime was committed because there's no record of a conviction or anything. And so it's rather vague. Doesn't the record before us include the records from California? It does. And he does, and that's a puzzle, quite frankly, because in preparing for this, I said, well, we have a record of some sort. But the trial court, I'm guessing he wasn't added or it wasn't accepted or something, but the trial court clearly said in the transcript there is no record of any conviction. And the questioning of Mr. Brissetto was vague. He wasn't sure of the disposition. But the BIA's view of this was that there were crimes that were committed that stopped the time because they applied the stop time rule to say that he could not apply for suspension of deportation. They said that, yes, and they were wrong, and that's why we're here. What they said is they ignored the transcript. But they looked back, didn't they? They said from time of – this is getting confusing. Yeah, it is confusing. They looked from the time that he was – he entered the United States. They said the time for him to accrue good conduct time, I'll call it, stopped when he committed those crimes. And they said, although you're here for – Exactly. They said you weren't here for seven years. I think it was just shy of that, which doesn't matter. But just shy of that, he got drunk and he stole a bottle of booze and a T-shirt from a Jiffy Mart, okay? And they say it stopped then, so we don't care if you're here for 50 years. It stopped back then, right? And we said, okay. But where we think the error clearly was is BIA said these are convictions, and they enumerated these convictions, and they disregarded the immigration judge and the evidence that was presented and the testimony of the government. And the immigration judge is saying, wait a minute, there's been no evidence put forward for that. BIA cannot disregard the findings of fact that were conducted and acknowledged. And in the transcript of the proceeding and the order, the judge makes very clear this issue. And BIA, I think, just kind of skipped over it and assumed because they read somewhere these acts were committed or alleged, that therefore it was a conviction, and certainly there's no record of that. But they didn't say conviction. They say quite the contrary. They say- So he needed to have committed, and the MJ was wrong. Right. You know, looking at your appendix at 5 going over 6, it says, we further clarify in the matter of Therese that continuous residence or physical presence is deemed to end on the date that a qualifying offense has been committed rather than on the conviction date. Isn't that the BIA saying, we don't care whether there's a conviction or not. There's evidence in the record showing a committed offense, and that's enough under our view of statute. Right. I think I said that earlier, and the immigration judge said that. The immigration judge says that. There's no evidence that these were committed. All he has is the contact with police and the arrest. Now, the immigration judge wanted to see a conviction, right? I think he did. And that's where the BIA said, no, just had to have been committed. Do you, in your brief, contest that these crimes were committed? We agree with the immigration judge that there was insufficient evidence as to the commission, according to the BIA adolescent standard, the commission of these crimes. Is that in your brief? Yes, yes. I'm getting very confused about that. Now, we cited the trial. We cited the immigration judge because he was looking at conviction, and he kept using the word conviction. We're going with what BIA says, and we're saying even if you're talking about mere commission, which is lesser, obviously, than conviction, it still occurred this way, and BIA cannot attempt to find at the hearing and in the transcript what was not introduced. Help us by telling us where that is. Yeah. Perhaps I can do it on rebuttal. I'll go back right now. All right. That's all right. I know it's on the transcript at page 254. All right. Thank you.  Sure. Would you like it to? Yes, I would. Thank you. Thank you. May it please the Court, John Unschein on behalf of the United States Attorney General. Your Honors, this case is really a straightforward application of this Court's precedent and law, and hopefully I can offer some clarity to the Court here as to what really happened in this case. First of all, this Court's scope of review is limited to the final order of the agency, and that is the order of the Board of Immigration Appeals. In this case, there were two. There was one in 2003 and one in 2005. This Court reviews both of those decisions because that is where the analysis lies. That gives you the decision that is before the Court here today. Now, mentioning of the immigration judge's decision, frankly, shouldn't be considered because, again, that's not the final decision of the agency. Under USC 1252A, that's all this Court reviews, the final decision. Can I have you address the due process argument that's been put forward in the briefing? We didn't get to it in the discussion here, but I'm curious to know, if I've understood the briefing, your opposing counsel says, look, the immigration judge thought that he or she couldn't respond to these arguments based on what the BIA said before, and the BIA wouldn't look at it. And so we've never had anybody look at our argument about the way the statute should properly be interpreted. Is there a due process problem with what happened below? No, Your Honor. Because? No, because, respectfully, the Board of Immigration Appeals did look at that argument. If you look at the decision, the Board of Immigration Appeals cited their prior decision as to why the petition in this case did not qualify statutorily for suspension of deportation. Where are you in the record? In the appendix? In the appendix would be the most recent order of the BIA, and that would be... Attached to the brief? Attached to the brief, yes, Your Honor. Attached to the appendix. The BIA says, we are not persuaded, this is in the second paragraph, actually the second to last sentence, we are not persuaded by responsible argument on appeal that he is eligible for suspension of deportation because we erroneously interpreted the statutory provisions for this relief, and they cite to the stop time rule. So, again, they looked at the argument and said the stop time rule applies, and that's why there's no due process issue here. Moreover, the fact that the immigration judge didn't review that claim is also something that shouldn't concern this court because under the Supreme Court case in Vermont Yankee, of course an agency can facilitate its duties the way that they deem most efficient without violating due process, of course. The BIA is an appellate body. They remanded much like this court might for a specific reason because they had already reached a decision regarding statutory eligibility. Let's see if there are any other grounds that he was eligible for relief. Exactly. Right. Let's go back to the beginning of your argument when you said that this case is controlled by precedents of this court. What precedents are you referring to? That would be this court's P&O decision, Your Honor, P-I-N-H-O, and that is... Penhode. Penhode, yeah. I said Penhode. That decision actually... What that decision effectively does, it affirmed the board's decision in a matter in Alaska which held that the stop time rule applies to the suspension cases as well as the current cancellation of removal cases. But does Penhode focus on subsection D-1A instead of D-1B? Maybe I'm confused, but I was under the impression that the specific subsection might not make any difference. You know, D-1 is D-1, you may say. But when you say it's controlled by Penhode, straighten me out if I'm wrong. That case was looking at D-1A and we're looking at D-1B here? It's yes or no. I'm not sure if I follow. What is D-1B? If you're talking about which provision of the suspension... Yeah, which one is in play and which one is going to be held to be retroactive. It would be... Well, the suspension provision that he was applying for was 244-A-1. The stop time rule provision would be... It's probably best if I take a look at it because I have it right here. The stop time provision, 244-A-D-1, states for purposes of this section, this section being the cancellation of removal section. That includes all provisions. This section, cancellation of removal, matter in Alaska says that this is the board decision, so that applies to suspension. This court in Penhode says that applies to suspension also. So this provision applies to everything involving suspension of deportation that involves continuous physical presence in the United States. So that's why Penhode applies here to all applications for that. But the water is muddied when we're dealing with a prior conviction, aren't we? Muddied by the Okeke case? I don't see how that would be, Your Honor. Actually, Okeke says, in a footnote, because that actually addresses sort of a different issue where one person, where an individual entered the United States, departed, then came back in, and they wanted to determine... Entered, committed an offense, convicted, departed, came back. Yeah. No, that's the sequence. The conviction is the important part. Actually, I believe the sole question in Okeke was, does he get a second crack at cancellation of removal because he's already been deported once? And Okeke held because he was... Actually, he'd already departed once. Because he was admitted into the United States in that case, he got an opportunity to apply for cancellation of removal again. Well, the question was whether the conviction constituted a stop-time event for all purposes. And the majority held in the case, as I recollect, that actually there were three opinions in the case, so there's not a clear majority opinion even in the case, but the ultimate outcome was that he could continue to accrue his good conduct time, as I'm calling it, upon his reentry into the United States, right? Yes, because his reentry basically absolved the prior crimes that he wasn't charged for the second time around when he came into the United States. So he started from a clean slate, essentially. That's not the case here. The argument that I thought was before us and that I thought was interesting was the provision of A-1 that said you had to have been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of application or notice of removal, whatever you want to say that. And so I was thinking it was a look-back, and he would have been okay, because 85 and 89 were prior to seven years of the look-back. But I assume that everyone would agree that when you use the words continuous presence, you have to look from the date of entry. Is that? That's the government's position on that, Your Honor. Government's position. What in the statute says that? Whenever you use those magic words, it means you have to start, no matter what, with the date of entry. Well, Your Honor, I try to look for a specific section that says that, and there are actually – I thought that we were going with the look-back argument here as well. However, let's say that that is the case. As the statute has written, you have to look back. The stop-time rule still is effective in that matter because the stop-time rule says that for purposes of continuous presence, that presence is deemed to end at that point. So if you look back from the date, as a legal matter, that person isn't before the application seven years prior. And that assumes that you have to look at it from the date of entry. And for purposes of statute that says you have to have continuous presence for 20 years, you know when to stop it. But for purposes of statute that says physically present for a continuous period and not less than seven years preceding, the question is, does that mean that regardless of whether it had stopped before for some other purpose, continuous presence can exist even though it had been stopped before? And I guess your answer is no. No, because the presence is no longer there. As a legal matter, that person is no longer present in the United States. But isn't it correct, as Judge Ambrose reasoned in Okecki, that with the way the government interprets the stop-time rule, you could never accrue, a person who's committed an offense that disqualifies them for suspension of removal could never accrue enough time? Well, that's true, Your Honor, but Congress promulgated the statutes that provide for that. And that is something that in its wisdom or the reason that they promulgated. They went about it in a very tortuous manner. In what way? Well, because they say you're eligible to apply for suspension of removal so long as in the preceding seven years you have not been committed of a crime, but then you have the stop-time rule that says if more than seven years ago you committed a crime, the time stops for you, so you could never accrue the seven years. Right, and that was an act of Congress that followed the earlier suspension provisions, Your Honor. And Congress chose to be clear on that because the thinking there is, in the matter of Perez's case, actually, that the Board of Immigration Appeals cites, they note that in that case, actually the Pinot case talks about the rational basis test there. It says that the basis for the stop-time rule is to expedite removal, to limit discretionary relief, and removing the incentives for delay. So whatever the reasons that Congress promulgated that statute, that is the law and it's very clear on its face. The period of presence is deemed to end. But you know what's interesting? The statutory provision says the alien has been physically present in the United States for a continuous period. And I'm not sure whether that – and here I'm second-guessing myself as to where I thought I was on this case – but I'm not sure if we're talking about accruing continuous presence. It's called physically present for a continuous period. I don't know. I don't know whether that's – it doesn't use the term, you know, continuous presence. It's a little different. Well, are we – do we have to give Chevron deference to the BIA's interpretation of how this works? Absolutely, Your Honor. Okay. And what did the BIA say about this in the Mendoza case? The Mendoza case? Yes. I was under the impression, and maybe this is a product of the research that is not specifically discussed by the parties, that the BIA has looked at this and said, look, it stops. The clock stops when there's a commission of an offense. And if that's what it says, then we have to give that deference. What does that mean in this case? Well, pardon my ignorance as to the Mendoza case, Your Honor. Mendoza-Sandino. Right. I'm not – I'm ignorant as to the specific holding of that case. Well, leave aside the specific case. Take it for purposes of discussion. If the BIA said something like that, would we be required to defer to their interpretation of the statute? Yes, Your Honor, because it's an interpretation of the Immigration and Nationality Act. And in that case, though, we would also have to – I would advise the Court that going back to what was initially discussed, because I do want to make a couple points on this. First of all, the crimes involving moral turpitude were admitted within the proceeding by Mr. Brisinga-Flores, and that's specifically in the record at the appendix 122 to 123. Initially, I thought the argument was that it wasn't in the record, but it's here, and I won't read it exactly unless the Court would like me to, but it actually involves an admission to both the stealing of a T-shirt as well as the theft of two bottles of rum. Well, what's the appendix reference again? I'm sorry. Page 122 and 123. Additionally, the discussion of scanty information in the immigration judge's decision had nothing to do with those two offenses. It had everything to do with the spousal abuse allegation, which the judge found there was no conviction record of. That's not what the Board held this case to hinge on, and that is two crimes involving moral turpitude. Also, Your Honor, there doesn't have to be a conviction per se, but rather a commission or an admission. The stop-time rule refers to Section 212 or 1182 of the statute, these charges of inadmissibility, which in there it says that an alien is inadmissible to the United States if they admit to having committed a crime involving moral turpitude. It doesn't require a conviction record. An admission is enough, and that's what happened in this case. But moreover, there is a conviction record with respect to one of the offenses as well as an FBI rap sheet in the record, and those are found in the appendix at pages 241 to 250. That is the conviction record for 1989, and as well as page 265 of the appendix for the 1985 conviction. So the convictions happened. They cut off the period of continuous physical presence, and for purposes of suspension of deportation, the Board of Immigration Appeals held correctly that the continuous presence deemed to end by proper application of the stop-time rule, and again, that presence no longer existed as a legal matter with respect to whether you look back or look forward. There is no statutory eligibility for this form of relief, and due process was accorded because he had a full opportunity to brief the matter. He did. The Board addressed it, and it did so in a manner that relied on a prior decision, which is perfectly acceptable because that still ties into the final decision of the Board of Immigration Appeals. I'm sorry. Why do you say regardless of whether you look backwards or look forward? Well, that was, I thought, the central argument in this case, and again, I don't know if it, I had to think about this and wrap my head around it as well, but the stop-time rule is very clear. That period of continuous presence ends. It doesn't, as a legal matter, I try to picture it as a person walking, and they just disappear, essentially, as a legal matter. They're no longer here, no matter the way you look at it. Well, the stop-time rule means it stops accruing, but I guess I was wrestling, and I think Judge Finasci is wrestling with the fact that we have a statute that doesn't say, yo, we're dealing with the stop-time rule. It says if you have been physically present for a continuous period, for seven years before the notice of intent of removal, which is what the case is we're saying, not the other provisions in here, and you look at that and you go, we're the Supreme Court, plain language. It says physically present for the continuous period. It doesn't say, oh, in the purposes of stop-time rule, if it's after the stop-time rule happened, then you can't be physically present, even though you're here. It's just nothing that ties the two together. What's your best case for the proposition that, obviously, you can't be physically present if the stop-time rule, you know, blocked it off in N85 and 89? And let me read directly from the statute, the stop-time rule. For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when an alien is served a notice to appear under Section 2398 or commits an offense. Which applies prospectively. It shall be deemed to end. Correct. So it ended for that purpose, then. Okay. No, I think I get your point. I see my time is up. I thank the Court. Thank you. I need help. Please, the Court. Judge Jordan, we had asked for our brief, where that language was contained. It starts on page 14, and I also referenced the appendix that we were talking about. And it was 45 and 46, and then page 48. And I would like to address the due process issue, if I could, very briefly. Please. Okay. Your Honors, this, there is a due process argument here. BIA did not permit Mr. Brissetto to submit a brief on all issues. What they said is you can submit a brief on the sole issue which it determined to be at issue. On remand, oh, and actually it stated in its order of November 9, 2005, and I'll quote it, he's afforded the opportunity to submit a brief for, you know, raising full and complete opportunity to pursue alternate relief. Okay. Nevertheless, on remand, when he went and attempted to submit that brief on July 8, 2004, the judge told him that he could not do that. And that was on the record, and the language is contained in the appendix at page 316. And so he was constrained to the sole issue that BIA had laid out for him, and the immigration judge expressly said, listen, you can take it up on appeal. No. And I think there is a due process and statutory problem because 8 CFR 124.40 says that if there is not going to be evidence taken in the appellate process on remand, he can submit a brief and he can raise all alternate issues and anything else he wants to for the immigration judge to consider. And quite frankly, I think that's as clear cut as some of the other issues are against him. And there's no denying in the appendix that that's what transpired, and I don't think I have to make too much argument about that. If he would have been, well, I won't say what he would have raised, but he did attempt to submit the brief and that is part of the appeal appendix. And not to beat this too much further, but your opponent says, wait, the BIA looked, he did make the argument he's talking about here. The BIA looked at it and rejected it. That's inaccurate. You're looking at me puzzled. No, no. I'm trying to be as accurate as I can. I just, I'm having a little bit of a hard time here because I have one side of the case telling me, wait a second. He had a chance to talk about his arguments about this statute in front of the BIA. Here it is. It was dealt with in the November order of the board. Quote, we are not persuaded by the response, so I'm going to appeal to these eligibles for suspension of deportation because we erroneously interpreted the statutory provisions for this form of relief, close quote. And so he made his pitch. The board rejected it. End of subject. Now, if I'm making you go back over the same ground twice, I apologize. But tell me what's wrong with that reasoning. Well, that's pretty good reasoning, and it makes its common sense. But if you look at 8 CFR 124-40, it says when you come back here, you can submit a brief essentially the way I read it. And I don't have the statute in front of me, but on any issue. And actually on new and alternative relief. And I think at that point they couldn't constrain him. The INS, the immigration judge, it was there for him to constrain him. Contrary to the statute, you can say I will not accept your brief. Well, the brief was going to address the question of the stop time rule. That's what he wanted to do. He wanted to re-argue the issue that the BIA had decided. Yes, I believe he did. And another issue, which would have been the moral turpitude. Okay. But that's it, unless the board has any other questions. Thank you very much. Thank you very much. All right. We can take the case under advisement and ask for it to recess to work. Please rise. This court is adjourned. The court is adjourned at 11 a.m.